IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| EDIE CRAINE KINNEY, | ) | |
| Plaintiff | ) | |
| v. | ) | No. 3:06-cv-376 (Phillips/Shirley) |
| UNIFIRST CORPORATION, | ) | |
| Defendant | ) | |

### **MEMORANDUM OPINION**

This is an action for sex discrimination and sexual harassment pursuant to Title VII, 42 U.S.C. § 2000e, *et seq.*, and for age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* Defendant contends that plaintiff knowingly and voluntarily released any such claims in exchange for four weeks of severance pay to which she was not otherwise entitled. Plaintiff denies that the release was knowingly and voluntarily executed.

Currently pending is the motion for summary judgment of the defendant with regard to the enforceability of the release [Court File #14]. For the reasons that follow, that motion will be denied.

## I.

### *Factual Background*

The following factual background is considered in the light most favorable to the plaintiff and is taken from deposition testimony and her affidavit.

Defendant UniFirst first employed the plaintiff in its Knoxville, Tennessee office as a sales representative from 1992 until 1996, and again from 1998 until June 29, 2005, the date she was terminated. As of the date of her termination, the Knoxville office was part of the Atlanta Sales Region, headed by General Manager Bob Kersey. At that same time, Branch Manager Tim Wardell headed the Knoxville Branch and Sales Manager Brandon Kemp supervised the sales representatives in Knoxville, including plaintiff. Affidavit of Edie Kinney at ¶ 2.

In approximately May 2005, UniFirst informed Ms. Kinney that the sales representatives in the Atlanta Region, including the plaintiff, had to achieve a quota of 80% of their sales goals by August 2005. On June 27, 2005, plaintiff attended a meeting which she understood would be a sales meeting. She had no idea at the time that her termination was being considered. Managers Wardell and Kemp informed her at that meeting that General Manager Kersey had instructed them to terminate her for failure to meet the sales quota. *Id.* at ¶ 3. At that meeting, Managers Wardell and Kemp presented Ms. Kinney with

a document entitled "Settlement Agreement and General Release" which, in relevant part, had the following provisions:

> In consideration for the payment of $700 wk/four weeks (less applicable federal, state and local withholdings) from UniFirst Corporation to me, which I am not otherwise entitled to, and which I shall be entitled to receive seven days after I execute this Agreement, I, Edie Craine, hereby release UniFirst Corporation (which shall include its current and former directors, officers, managers, employees, agents, subsidiaries, affiliates, successors and assigns) from any and all claims, damages and causes of action I have or could claim to have against UniFirst Corporation. This release includes any and all claims relating to my employment by and resignation/termination from UniFirst Corporation effective July 1, 2005, including without limitation all claims for wages, vacation (other than earned/unused vacation that will be paid upon termination), bonuses, severance or any other form of compensation, all claims for wrongful discharge in contract or tort, all claims under any federal, state or local discrimination statute, including any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626, *et seq.*, all claims for breach of contract, whether express or implied, and all claims for reinstatement, attorney's fees and costs.
>
> I acknowledge that I have been given the opportunity, if I so desire, to consider this Agreement for twenty-one (21) days before executing it. In the event I have executed this Agreement within less than twenty-one (21) days of the date of its delivery to me, I acknowledge that such decision was entirely voluntary and I had the opportunity to consider this Agreement for the entire twenty-one-(21) day period. I acknowledge that for a period of seven (7) days from the date of the execution of this Agreement, I shall retain the right to revoke this Agreement by written notice to UniFirst Corporation, and that this Agreement shall not become effective or enforceable until the expiration of such revocation period. This Agreement represents the entire Agreement between myself and UniFirst Corporation and all previous agreements, arrangements or promises between myself

> and the UniFirst Corporation are superseded except for the Employment Agreement and Covenant Not To Compete, if any. I confirm that no claim, charge, complaint, or action exists in any forum or form. In the event that any such claim, complaint or action is filed, I shall not be entitled to recover any relief or recovery therefrom, including costs and attorney's fees.
>
> I understand that if this Agreement and General Release are not signed, I would have the right to voluntarily assist other individuals and entities in bringing claims against UniFirst Corporation. I hereby waive that right and will not provide any such assistance other than assistance in an investigation or proceeding conducted by an agency of the United States Government or State Government.
>
> . . .
>
> I have read this Agreement, understand its terms, and have signed it voluntarily. I understand that this Agreement is a legal document and will have legal consequences. I have been given the opportunity to discuss this document with an attorney.

Defendant's Exhibit 1.

In her affidavit, Ms. Kinney claims that Managers Wardell and Kemp informed her that she had two options: she could sign the Agreement and receive two weeks of severance pay or she could sign the Agreement and receive four weeks of severance pay. She told them that she had questions about the Agreement, that she was not a "legal beagle," and that she would like to consult an attorney. Mr. Wardell responded that the Agreement was not worth the paper it was written on, and neither of the men offered to answer any questions or to give her opportunity to consult with an attorney. Approximately ten minutes into the meeting, General Manager Kersey called Managers Wardell and Kemp by phone.

4

Wardell and Kemp and Ms. Kinney spoke for approximately one minute to Kersey on the phone, at which time Wardell and Kemp asked Ms. Kinney to leave the room. She did so.

Upon leaving the room, Ms. Kinney called an attorney, Wendell K. Hall. She says she called counsel because it was clear to her that Wardell and Kemp were not going to answer questions about the Agreement and had told her that the Agreement was not negotiable. She wanted an attorney to review the Agreement. However, she was not allowed to have a copy of it when she left the room and did not have the Agreement as she spoke with counsel. Her conversation with counsel lasted approximately five minutes when she was told to return to the room. By the time she returned to the room, Mr. Wardell had removed the Agreement and told plaintiff that Mr. Kersey was now attempting to obtain a transfer for her to South Carolina. After Kersey mentioned the possible transfer at the May 27th meeting, the meeting ended without approval of either a transfer or plaintiff's termination.

The entirety of Ms. Kinney's meeting on the 27th with Wardell and Kemp was approximately 20 minutes, and she had access to the Agreement only approximately ten of those minutes. During the approximately ten minutes she had access to the document, most of the time was spent talking and she was not given the opportunity to review the document alone. Because the release was relevant only if Ms. Kinney was to be terminated, Wardell kept the unsigned written release at the end of the meeting as it was irrelevant if Ms. Kinney was going to accept a transfer. Plaintiff claims that on June 28, 2005, Wardell called her and

5

told her that she had until 9:00 a.m. on June 29 to make a decision. He told her to meet him at the Knoxville Branch at that time to sign termination papers for her employment to end on July 1, 2005. He further told her what financial terms the Agreement would include. During the interim between the June 27 meeting and the follow-up meeting on June 29, Ms. Kinney had no opportunity to review the Agreement or present it to anyone else for review. She did not contact her attorney during that period. Edie Kinney Affidavit at ¶ 10.

Consistent with Mr. Wardell's instructions Ms. Kinney appeared at the Knoxville Branch on June 29, 2005. Only Mr. Wardell and she were present to meet and discuss the termination and possible transfer. Mr. Wardell presented the Agreement to her and again instructed her that she could neither leave the room with the Agreement nor forward the Agreement to anyone else. Edie Kinney Affidavit at ¶ 11.

According to the plaintiff, Mr. Wardell instructed her to sign the Agreement and told her that the Agreement was not worth the paper it was written on. She told Mr. Wardell that she did not want to transfer anyway because the company would not pay her moving expenses and that her husband had started a new job in Knoxville.

The June 29, 2005 meeting with Mr. Wardell lasted approximately five minutes, at which time Mr. Wardell asked Ms. Kinney to leave the room while he contacted the Human Resources Director, Mr. Mark Camus. She left the room, again unable to take

6

the Agreement with her. Mr. Wardell called her back into the room and they met for approximately five more minutes before it ended. On this occasion, Ms. Kinney's total time with the Agreement was approximately five minutes, and all of that time was spent with Mr. Wardell present while they were conversing. Ms. Kinney claims that she was never given adequate time to review the Agreement or to consider whether to sign the Agreement. At this June 29th meeting, UniFirst presented Ms. Kinney with only the Agreement reflecting termination and provided no other documents.

To an extent, plaintiff's deposition testimony is inconsistent with that presented in her affidavit. In her deposition, she testified as follows:

>   Q. Okay. I asked you a minute ago why you signed the agreement and you told me what we've just been talking about, the personal reasons, and then what was the other reason that you signed the agreement? I think you had two things in there, as I recall.
>
>   A. Because they told me that Wednesday I was either going to be transferred, it would be a transfer paper or it would be that I am no longer employed with the company.
>
>   . . .
>
>   Q. You asked Tim about that?
>
>   A. Just to reiterate everything to make sure I understood. A couple of days had passed, I was not quite as emotional as I was the first day that it was presented to me.

Q. And let's make sure we got it all. What all did he tell you and what all did you discuss in the meeting on the 29th?

A. He told me that I had – as we had talked about on Monday, that I had to sign the papers that were presented in front of me for the four weeks severance, which was the best deal that Bob could work out for me, and turn in my stuff before I left.

Q. You had to sign it?

A. Yes.

Q. What was preventing you from standing up and walking out the door and not signing anything?

A. Tim told me that Bob said there was no negotiations, that this was how it was. It was either four weeks or two weeks. That was it.

Q. But you could have gotten up and walked out the door and not gotten either four weeks or two weeks, correct?

A. Well, looking back at it now, maybe I could. But two years later it's easier to look at things different than you do when you're in the situation and you're being told what to do.

Q. To be clear, the only thing that prevented you from getting up and not signing anything and walking out the door was the fact that you wanted to get the four weeks of severance pay and you weren't going to get the severance pay if you didn't sign the agreement?

A. That's true.

Deposition of Edie Kinney at pp.53, 60-61.

Ultimately, plaintiff signed the Agreement on June 29th and it was dated July 1st. She does not dispute that she was allowed to keep a copy of the Agreement after she had signed it. She accepted the four weeks of severance pay and has not attempted to return it to the defendant. She made no attempt within the seven day period following the execution of the Agreement to seek to revoke it in writing or to confer with her attorney with the Agreement.

## II.

## *Analysis*

The United States Court of Appeals for the Sixth Circuit has recognized that under particular circumstances employers and employees may negotiate a valid release of ADEA and Title VII claims. *Runyan v. National Cash Register Corp.*, 787 F.2d 1039 (6th Cir.), *cert. denied*, 479 U.S. 850 (1986). The Sixth Circuit has applied ordinary contract principles in determining whether such a waiver is valid, remaining alert to insure that employers do not defeat the policies of the ADEA and Title VII by taking advantage of their superior bargaining position or by overreaching. *Runyan*, 787 F.2d at 1044-45. In evaluating whether a release has been knowingly and voluntarily executed, courts look to (1) plaintiff's experience, background, and education; (2) the amount of time plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) the consideration for the waiver; as well as

(5) the totality of the circumstances. *Adams v. Phillip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995) (citing *Bormann v. AT&T Communications*, 875 F.2d 399 (2nd Cir.), *cert. denied*, 493 U.S. 924 (1989)).

Upon a careful review of the record, assuming the facts in the light most favorable to the plaintiff, the court finds that a question of fact remains as to whether or not the release was knowingly and voluntarily executed. Plaintiff worked for a number of years as a sales representative in businesses in which the customers signed contracts and she would undoubtedly have known the consequences of their signatures. However, there is no evidence that she had any knowledge of employment contracts. Plaintiff testified that she was given only a few minutes to glance at the release and not anything close to the twenty-one days the release promises and the statute requires. The consideration given was for a relatively small amount and plaintiff was told she could either take it or leave it – there would be no negotiation. She was not allowed to take a copy of the release home to review herself or with the help of an attorney. If plaintiff's testimony is believed, then the release was signed under duress and without ample opportunity to consider the consequences.

III.

*Conclusion*

In light of the foregoing, the court concludes that genuine issues of fact remain to be determined, and defendant's motion for summary judgment [Court File #14] will be DENIED.

Order accordingly.

                                                   *s/ Thomas W. Phillips*
                                              UNITED STATES DISTRICT JUDGE